UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

ALFRED SHINARD, #274-483,

    Plaintiff,

v.

WEXFORD HEALTH SERVICES INC.,
P.A. FLURRY,
DR. COLIN OLTEY,
N.P. JANETTE CLARK,
DR. AVA JOUBERT,
DR. ASHRAF MABOOB,
DR. ASRESAHEGN GETACHEW and
HOLLY PIERCE, *Nurse Practitioner*,

    Defendants.[1]

Civil Action No. TDC-17-3774

## MEMORANDUM OPINION

Plaintiff Alfred Shinard, an inmate incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, has filed a civil action against Defendants Wexford Health Sources, Inc. ("Wexford"), Physician's Assistant Greg Flury, Dr. Colin Ottey, Nurse Practitioner Janette Clark, Dr. Ava Joubert, Dr. Mahboob Ashraf, Dr. Asresahegn Getachew, and Certified Registered Nurse Practitioner Holly Pierce, asserting violations of the Eighth and First Amendments to the United States Constitution arising from the alleged failure to provide adequate medical care and alleged retaliation for filing a grievance. Pending before the Court is Defendants' Motion for Summary Judgment, which is fully briefed. Upon review of the submitted materials,

---

[1] The Clerk shall amend the docket to reflect the correct names of Defendants Wexford Health Sources, Inc., Greg Flury, Dr. Colin Ottey, Dr. Mahboob Ashraf, and Dr. Asresahegn Getachew.

the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED.

**BACKGROUND**

Shinard has been diagnosed with mild degenerative disc disease at the L5-S1 of the lumbar spine with disc herniation resulting in radiculopathy to the lower extremities. As a result of his condition, Shinard is a chronic care program patient who is scheduled for periodic evaluation. He has previously received medication, physical therapy, and epidural injections to treat his back pain. According to Shinard, in 2013, Dr. Cornell Shelton, a physiatry specialist at Bon Secours Hospital, informed him that surgery would be required. According to Shinard's medical records, Dr. Shelton examined Shinard on May 31, 2012 and recommended an increase in the dosage of Neurontin, a prescription pain medication; a magnetic resonance imaging ("MRI") procedure on his lumbosacral spine; a prescription for the muscle relaxant Baclofen; and traction and ultrasound therapy.

In July 2013, Shinard was transferred to NBCI, where Defendants began providing him medical treatment. According to Dr. Getachew, the Medical Director for Utilization Management with responsibility for NBCI during most of the relevant time period, conservative medical management is the first line of treatment for lumbar back pain with disc herniation and radiculopathy. Recommended treatment thus includes patient education, pain medications, cortisone injections around the spinal cord, physical therapy, and rest. If, after such conservative treatment, the patient is unable to perform activities of daily living, surgery is considered as a last resort.

According to Shinard, when he arrived at NBCI, he informed medical staff of his need for surgery. He received various medications, including Neurontin, Tramadol, and Baclofen, was given a cane, was assigned to bottom bunk status, and was regularly seen by medical staff.

Shinard's intake evaluation at NBCI took place on August 5, 2013. From November 14, 2013 to March 14, 2014, he was seen by medical staff for back pain approximately once every three to four weeks. In April 2014, he began physical therapy sessions but could not always complete them because of pain. A neurosurgery consultation request was submitted, denied, but then resubmitted. From April 24, 2014 to May 30, 2014, medical staff continued to monitor Shinard's back pain during regular visits. On June 5, 2014, an x-ray of Shinard's lumbar spine was performed and revealed no acute disease. Shinard continued to have scheduled medical visits from June to September 2014. In October 2014, an MRI was performed on his back.

On November 19, 2014, on Dr. Ashraf's recommendation, Shinard was examined by Dr. Charles Park, a neurosurgeon at Mercy Hospital. Dr. Park recommended conservative treatments, physical therapy, and a follow-up visit but did not recommend surgery. In December 2014, Shinard was approved for physical therapy as well as the use of a bottom bunk and a medical shower for a year. On January 20, 2015, Shinard began his recommended physical therapy sessions. He also had a chronic care visit, at which time his prescription for Naproxen was renewed. Shinard attended six additional physical therapy sessions through February 19, 2015 but continued to express concern that his pain would not improve without surgery.

On February 25, 2015, Shinard saw Dr. Ashraf after complaining of excruciating pain in his left foot. As a result, Dr. Ashraf increased the dosage for Shinard's Neurontin prescription and resumed a prescription for Ultram. On March 13, 2015, Shinard saw Dr. Ashraf again after complaining of severe back pain. Noting that Shinard had completed physical therapy, Dr. Ashraf

3

requested a consultation with Dr. Park and recommended that Shinard continue taking his medications. In April 2015, Dr. Getachew decided that Dr. Park would be consulted on whether a steroid injection or nerve block treatment would be appropriate.

In May 2015, in light of Shinard's continued complaints about pain, Dr. Ashraf approved the use of a handicapped-accessible cell and submitted a second request for consultation with a neurosurgeon. Dr. Ashraf also restricted Shinard from work and gym activity and ordered bed rest feedings for a week. Dr. Getachew then approved Shinard for evaluation with a pain specialist and for a spinal cord injection. However, on June 20, 2015, Shinard refused to see the offsite pain specialist at Bon Secours Hospital and insisted that he instead be sent to see Dr. Park, the neurosurgeon at Mercy Hospital.

According to Shinard, Dr. Ashraf stated that he would request consultation with a neurosurgeon, while Shinard states that he followed Dr. Getachew's recommended course of action until September 2015, but it provided little relief. On July 27, 2015, Shinard had a telemedicine conference with Dr. Ashraf and Dr. Getachew to discuss plans for pain management. According to Dr. Ashraf, after a discussion about possible complications, Shinard stated that he did not want to have surgery. Rather, he agreed to engage in physical therapy with a traction machine, which would be sent to NBCI for his use. Shinard had physical therapy sessions with traction from August 2015 to October 2015. During a visit with Dr. Ashraf on September 29, 2015, Shinard reported improvement in his pain level with traction therapy. Shinard requested a cortisone injection at the lumbar disc and again requested to see Dr. Park.

On November 5, 2015, after Shinard had been observed doing numerous exercises without difficulty, his cane, medical cell, and medical shower were discontinued, and his pain medication was decreased. From December 2015 to February 2016, Shinard was approved for, and continued

4

to attend, physical therapy sessions. On February 2, 2016, during a chronic care visit, Dr. Ashraf noted that Shinard's pain has significantly improved after therapy. Dr. Ashraf continued Shinard's prescriptions for Neurontin and Baclofen but stated that Shinard did not need Ultram because he was on enough medications for pain relief.

From March to April 2016, however, Shinard reported worsening of his pain during scheduled visits. Shinard began taking Cymbalta for pain but it was replaced by Neurontin in May 2016 after Shinard stated that Cymbalta was not helping him. On September 15, 2016, Shinard underwent an MRI of the lumbar spine. According to the diagnostic imaging report, "[a]t L5-S1 there is mild disc desiccation and slight disc space narrowing and mild endplate degenerative discogenic signal change." Med. Records 194, Mot. Summ. J. Ex. 1, ECF No. 21-4. On September 26, 2016, an NBCI medical provider submitted a request for re-evaluation by Dr. Park.

During an examination on November 4, 2016, Dr. Park noted that traction physical therapy had provided temporary relief and recommended injections. Shinard continued to complain about pain in 2017. On January 12, 2017, a pharmacist advised him that he has chronic pain syndrome, that currently available pain treatment results in about a 30 percent decrease in pain on average, so his pain cannot be completely cured. On January 30, 2017, Shinard was approved to see Dr. David Maine, a pain specialist at Mercy Hospital, to begin receiving injections.

After his initial appointment in March 2017 was canceled due to transportation issues, Shinard saw Dr. Maine on June 12, 2017 for an epidural steroid injection. Afterwards, Shinard reported a 60 percent improvement, but he still had pain despite the injection. He stated that he did not want an increase in medication but requested physical therapy with traction. On June 26, 2017, a medical provider at NBCI placed a request for consultation with Dr. Park. On June 29, 2017, Dr. Joubert approved an offsite consultation, but recommended a CT scan of the lumbar

5

spine rather than a visit with a neurosurgeon. On July 6, 2017, Shinard began his fourth round of physical therapy. On September 22, 2017, Shinard underwent the CT scan, which showed a disc bulge on the left at L5-S1 that appeared to be compressing the nerve root.

While awaiting his CT scan, Shinard continued to visit Dr. Ashraf. Shinard claims that in August 2017, Dr. Ashraf informed him that Dr. Getachew denied a follow-up injection as well as the renewal of any pain medication. On September 21, 2017, Dr. Ashraf issued medication renewals for Tramadol and Neurontin. According to Shinard, Dr. Joubert then refused to renew his prescription for Neurontin and his follow-up injection. Dr. Ashraf's request for Tramadol was, in fact, disapproved in favor of further physical therapy. However, on October 17, 2017, Dr. Getachew approved the prescription for Tramadol until Shinard returned to the neurosurgery clinic for a follow-up visit.

Shinard reported for physical therapy on October 26, 2017, but he failed to attend sessions on October 31, 2017 and November 2, 2017 and refused to attend a scheduled medical visit on November 3, 2017. Shinard missed additional physical therapy sessions on November 7, 9, 14, and 16. On November 30, 2017, he reported for physical therapy with no new complaints, but he again missed a physical therapy session on December 5, 2017. On December 14, 2017, Shinard was approved for a follow-up consultation with a neurosurgeon.

On December 21, 2017, Shinard filed his Complaint in the present case, alleging deliberate indifference to a serious medical need, in violation of the Eighth Amendment. He asserts that he continues to experience severe pain as a result of Defendants' denial of Tramadol, Neurontin, and steroid injections, as well their failure to conduct necessary medical examinations before discontinuing such treatment. He seeks monetary damages and injunctive relief.

From January to April 2018, Shinard reported for scheduled medical visits. On April 3, 2018, Defendant Pierce noted that the prescriptions for Baclofen and Ultram would be tapered off because they are not intended for long term use. On April 29, 2018, Shinard had a telemedicine conference with Dr. Getachew. Shinard reported that he was satisfied with his current pain regimen. Dr. Getachew recommended that Shinard should receive another MRI and that he should be considered for a neurosurgery evaluation for a possible injection or surgical discectomy.

On May 2, 2018, Shinard filed an Amended Complaint in which he claimed that during a sick call on April 2, 2018, he spoke to Pierce about neurological symptoms he had been experiencing without relief. According to Shinard, Pierce did not examine any of the areas he referenced and stated that she would not order any medications other than Depakote. Shinard also stated that Pierce refused to recommend him to a different provider or to check his medical records. Shinard asserted that Pierce's actions were motivated by Shinard's previous filing of grievances against Pierce through the Administrative Remedy Procedure ("ARPs").

On May 21, 2018, Shinard reported for a sick call visit and requested Tramadol after his prescription lapsed. A prescription for Naprosyn was issued. On July 11 and 14, 2018, Shinard refused physical examinations. On July 18, 2018, he was seen by Dr. Abdul-Kareem Ahmed, a neurosurgeon, who recommended that Shinard undergo another CT scan and MRI.

As of October 2018, Shinard claimed that he has not received any pain medication since May 3, 2018. In Shinard's Supplement to the Complaint filed on November 28, 2018, he reported that he underwent an MRI in August 2018. He also asserted that Pierce admitted to Dr. Getachew that she had failed to renew medication because of Shinard's prior grievances against her. Shinard claims that Defendants continue to delay his treatment as well as interfere with the recommendations of the neurosurgeon and specialists. According to the correctional officer

assigned to Shinard's housing tier, as of August 8, 2018, Shinard continues to perform two jobs at NBCI, both of which require him to walk around the tier and up and down the steps carrying stacks of trays.

## DISCUSSION

Defendants move for summary judgment under Federal Rule of Civil Procedure 56. In support of their Motion, Defendants argue that: (1) Shinard's allegations occurring prior to December 21, 2014 are barred by the statute of limitations; (2) Shinard has failed to show that Defendants were deliberately indifferent to a serious medical need; (3) Shinard is not entitled to injunctive relief; and (4) Shinard has not asserted a viable retaliation claim against Pierce. In his memorandum in opposition to the Motion, Shinard withdrew his claims as to Defendants Flury and Dr. Ottey. Those Defendants are therefore dismissed from this suit. The Court will address Shinard's claims against the remaining Defendants.

### I. Preliminary Motions

On November 28, 2018, after Defendants had filed a Motion for Summary Judgment and the motion was fully briefed, Shinard filed a Supplement to the Complaint. On December 10, 2018, Defendants filed a Motion to Strike, or in the Alternative, Opposition to Plaintiff's Motion to Supplement the Complaint ("Motion to Strike"), asserting that Shinard's filing constituted an impermissible surreply. On December 20, 2018, Shinard filed a "Motion for Clarification as to Case Docket Entries," in which he stated that he had not received Defendants' reply memorandum on the pending Motion for Summary Judgment and asked that a copy be sent to him. ECF No. 31. On December 28, 2018, counsel for Defendants filed a letter establishing that she had sent a duplicate copy of the reply memorandum to Shinard. Shinard's Motion for Clarification, ECF No. 31, is therefore denied as moot.

As for Defendants' Motion to Strike, Defendants correctly note that under Local Rule 105.2, a surreply is not permitted absent leave of the Court. However, because Shinard apparently had not yet received Defendants' reply memorandum when he filed the Supplement, the Court cannot construe it as a surreply. Instead, it shall be construed as a request to supplement the Complaint under Federal Rule of Civil Procedure 15(d), which provides that a court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Because the proposed Supplement contains additional facts occurring after the filing of his Amended Complaint offered to support his existing claims, the Court will accept the Supplement, and the Motion to Strike, ECF No. 30, will be denied.

## II. Legal Standards

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## III. Eighth Amendment

Shinard asserts that Defendants violated the Eighth Amendment through deliberate indifference to a serious medical need. In order to state an Eighth Amendment claim arising from inadequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional

circumstances. *Id.* Moreover, even if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Although Shinard plainly has an objectively serious medical condition, the record does not support a finding that Defendants acted with deliberate indifference to that need. Dr. Getachew has explained that conservative medical management is the first line of treatment for Shinard's lumbar condition. He stated that surgery should be considered only if Shinard is unable to meet activities of daily living after trying other treatments such as pain medications, cortisone injections around the spinal cord, physical therapy, and rest. The medical records establish that on the occasions when Shinard complained to the medical staff about his back pain, he was routinely evaluated by Defendants and other medical care providers and given some or all of these forms of treatment. From August 5, 2013, the day of his intake at NBCI, to July 24, 2018, Shinard was scheduled for approximately 58 visits with medical providers and five rounds of physical therapy, in addition to 18 sick calls. Shinard was provided several forms of medication, including Neurontin, Tramadol, Ultram, Baclofen, Naproxen/Naprosyn, Cymbalta, and ibuprofen. Shinard acknowledges that Defendants provided increases in the dosage of pain medications over the course of his time at NBCI. In addition, Shinard recognizes that Defendants have recommended "medical housing to accommodate his need for railings . . . , a cane, bottom bunk assignment, and a back brace." Opp'n Mot. Summ. J. 2, ECF No. 26. As part of physical therapy, Defendants arranged for a traction machine to be delivered to NBCI for his use, and the traction proved to be one of the most effective forms of treatment.

Shinard also received consultations with several offsite physicians, including neurosurgeons and pain management specialists, and underwent MRIs and CT scans on several

11

occasions. Although Shinard notes that a doctor he saw before arriving at NCBI had suggested surgery and that he asked NBCI medical staff about surgery multiple times, he has received three different consultations with neurosurgeons, either Dr. Park or Dr. Ahmed. Significantly, each time the neurosurgeon declined to recommend surgery and instead directed that Shinard receive physical therapy, medication, steroid injections, or an additional CT scan or MRI of the spine. Shinard's Eighth Amendment claim therefore amounts to a disagreement between an inmate and his medical care providers over the appropriate care, which does not constitute an Eighth Amendment violation absent exceptional circumstances. *See Scinto*, 841 F.3d at 225. Where Defendants and other medical providers gave regular attention to Shinard's condition, provided medical treatment, and consulted with specialists, the Court concludes that the record, even viewed in the light most favorable to Shinard, does not provide such circumstances that would support a finding that they acted with deliberate indifference to his medical needs. The fact that the course of treatment did not resolve his pain does not alter this conclusion, because the lack of success does not establish deliberate indifference. *See Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001) (stating that an official who actually knows of a substantial risk to inmate health may be found free from liability if the response to the risk was reasonable, "even if the harm was not ultimately averted"). Indeed, Shinard was advised that currently available pain treatment for his condition cannot completely relieve him of all pain.

Because there is no genuine issue of material fact whether Defendants acted with deliberate indifference to a serious medical need, the Court will grant summary judgment on the Eighth Amendment claims.

## IV.  Retaliation

Shinard also alleges that Pierce retaliated against him for filing an administrative complaint against her on December 27, 2017. According to Shinard, Pierce told him during a sick call visit on April 2, 2018 that she did not know about any neurosurgeon visit, that she would not renew his Neurontin prescription or prescribe any medication other than Depakote, and that she would not refer him to a more credentialed medical provider. Shinard alleges that two days later, Pierce told him that her "stance becomes more resolved when inmates write complaints." Am. Compl. 5, ECF No. 5. Shinard also alleges that in September 2018, Pierce failed to acknowledge sick calls. On September 27, 2018, Shinard filed another ARP complaining of this failure. Pierce denies taking any retaliatory action against Shinard.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). An action adversely affects a plaintiff's First Amendment rights if it would "deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500). A causal connection between First Amendment activity and the alleged retaliatory action may be established by circumstantial evidence, such as evidence that the defendant was aware of the First Amendment

activity and that the retaliation took place within some "temporal proximity" of that activity. *See Constantine*, 411 F.3d at 501.

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228 (2001). Accordingly, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the United States Court of Appeals for the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 545 (4th Cir. 2017). *See also Santiago v. Blair*, 707 F.3d 984, 991-92 (8th Cir. 2013); *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). Thus, Shinard's filing of ARPs in December 2017 and September 2018. was protected activity under the First Amendment.

However, Shinard has not shown that Pierce took an action adversely affecting his First Amendment rights that was caused by the filing of his ARPs. Although discontinuing necessary medication arguably could be the type of conduct that would deter a prisoner from filing a grievance, the record does not support the conclusion that this decision was retaliatory. Dr. Getachew has attested to the soundness of Pierce's decisions relating to medication. Moreover, Pierce's alleged denial of a Neurontin prescription in April 2018 was the same position she had allegedly taken in December 2017, *before* Shinard filed his ARP. Indeed, in the December 2017 ARP, Shinard specifically complained that Pierce had told him, "I am not prescribing or recommending any medication for you except 'Depokat' and that "when the other pain medication stops that's it." ARP No. NBCI-0018-18 at 2, Opp'n Mot. Summ. J. Ex. 6, ECF No. 26-11. Where

Pierce had taken this stance prior to the filing of an ARP, her alleged post-ARP refusal to prescribe additional medication cannot reasonably be found to have been caused by the filing of the grievance.

Likewise, although Shinard claims that on April 2, 2018, Pierce refused to refer him to higher level medical providers, he made this exact same complaint about Pierce in his December 2017 ARP. Significantly, on April 29, 2018, Shinard, in fact, had a telemedicine conference with Dr. Getachew, the Medical Director, who then recommended that Shinard receive another MRI and be considered for a neurosurgery evaluation. Under these circumstances, the claim that Pierce retaliated against Shinard by refusing to refer Shinard to a higher-level medical provider cannot succeed.

Finally, Shinard's claim that Pierce retaliated against him by refusing to respond to sick calls is refuted by the record. Although he complained in an April 2018 ARP that he was not seen on March 30 and 31, 2018 and had an April 2, 2018 visit with Pierce canceled, he then had a medical visit with Pierce one day later, on April 3, 2018. As noted in the Warden's response to Shinard's September 27, 2018 ARP complaining that his sick call requests went unmet, two August 2018 sick call requests by Shinard resulted in evaluations within one day; only a third, on August 28, 2018, resulted in a prescription refill but no visit. More broadly, after Shinard's first two ARPs were filed, Pierce nevertheless was prepared to conduct a physical examination of Shinard on two separate occasions in July 2018, but Shinard did not attend. Finally, the fact that Shinard filed another ARP against Pierce on September 27, 2018 illustrates that a single missed sick call visit is not the type of conduct that would dissuade a prisoner from exercising his First Amendment rights. Because the record does not support Shinard's claim that Pierce retaliated against him for filing ARPs, the Court will grant the Motion as to this claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted. A separate Order shall issue.

Date: February 26, 2019

THEODORE D. CHUANG
United States District Judge